**LACKS INDUSTRIES, INC.,**
a Michigan corporation,
Plaintiff,

v.

**MCKECHNIE VEHICLE COMPO-NENTS USA, INC.,** d/b/a Thompson International, a Delaware corporation, Hayes Wheels International, Inc., a Delaware corporation; and Hayes Wheels International Michigan, Inc., a Michigan corporation, Defendants.

No. Civ.96–75692.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 22, 2005.

David W. Wicklund, Shumaker, Loop, Toledo, OH, Remy J. VanOphem, VanOphem & VanOphem, Shelby Twp., MI, for Plaintiff.

J. Michael Huget, John C. Blattner, Pamela M. Zauel, Butzel, Long, Ann Arbor, MI, Josh J. Moss, Stephen E. Glazek, Monique K. Cirelli–Seely, Barris, Sott, Detroit, MI, for Defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

Defendants move to set aside the judgment with respect to the public use defense for fraud upon the court, or in the alternative, move to set aside the judgment pursuant to Fed.R.Civ.P. 60(b)(2) and (3). Defendants make three objections to the special master's report and recommendation regarding that motion. Having considered both the report and the objections to it, I adopt the following recommendations of the special master for the reasons stated in his report:

- I DENY WITH PREJUDICE the portion of the motion regarding the proper interpretation of the '631 patent document because the issue of the possible fraud upon the court has not been established by clear and convincing evidence; and

- I permit Defendants to take limited and sharply-focused discovery concerning (1) the extent and timing of knowledge of the various counsel for Lacks on the "well known" drawbacks of the adhesive patterns referenced at pages 10–12 of the specification of that application; and (2) the role of Mr. Van Ophem in the writing, signing, reading, or approval of the post-trial infringement suit pleadings on the alleged absence of voids in the adhesive coverage of the pre-critical date Ford prototype wheels assembled by Defendants ostensibly in accordance with the disclosure of the '631 patent.

I DISMISS WITHOUT PREJUDICE the remainder of the motion pending completion of that discovery, after which Defendants may renew their motion for both fraud upon the court and the alternative grounds of Fed.R.Civ.P. 60(b)(2) and (3). The statutes of limitations for those motions are tolled by the filing of this motion.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION ON DEFENDANTS' JOINT MOTION TO SET ASIDE JUDGMENT WITH RESPECT TO PUBLIC USE DEFENSE FOR FRAUD UPON THE COURT

RICHARD D. GRAUER, Special Master.

Presently before the Court is Defendants' joint motion to set aside one portion of the judgment entered in favor of Defendants on April 23, 2001. According to that judgment:

(1) Cladded wheels jointly manufactured by the Defendants were held to infringe certain claims of Plaintiff's U.S. Patent No. 5,597,213 ("the '213 Patent"), if those claims were valid;

(2) Defendants did not have the claimed invention in public use or on sale more than one year before the filing date of the '213 Patent, and therefore the '213 Patent was not invalid under 35 U.S.C.

§ 102(b) on that basis (*i.e.,* "the Public Use Defense");

(3) Plaintiff placed the claimed invention on sale more than one year before the filing date of the '213 Patent, and therefore the '213 Patent was invalid under § 102(b) on that basis (*i.e.,* "the On Sale Defense").[1]

On appeal, the Court of Appeals for the Federal Circuit affirmed this Court's judgment with respect to issues (1) and (2) above, but remanded the case for further findings of fact with respect to issue (3) because of a change in the law concerning the "on sale" bar of § 102(b) effected by *Group One Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041 (Fed.Cir.2001). *Lacks Industries v. McKechnie Vehicle Components USA,* 322 F.3d 1335 (Fed.Cir.2003). Proceedings pursuant to the remand are ongoing before the Special Master.

The Defendants' present motion seeks to set aside the portion of the judgment that rejected the Public Use Defense, contending that a fraud was committed upon the Court. Defendants contend that "Plaintiff overcame said defense by persuading the court to adopt a certain interpretation of a patent owned by Defendant Hayes, based upon repeated assertions by Plaintiff's patent counsel as to the nature and effect of the Hayes patent, and where it has now emerged that Plaintiff was contemporaneously making directly contradictory assertions about the same Hayes patent in a patent application filed *ex parte* in the U.S. Patent and Trademark Office" (Defendants' Joint Motion, p. iv). The motion is based upon Fed.R.Civ.P. 60(b)(2) and (3).

The Amended Order of Appointment of Special Master, dated February 17, 2005, extended the Special Master's duties in this lawsuit to include preparation of a Report and Recommendation with respect to this joint motion. The Special Master heard oral argument on April 8, 2005.

### A. *The Patent–in–Suit*

In this patent infringement suit, Plaintiff Lacks Industries, Inc. ("Lacks") accused Defendants McKechnie Vehicle components USA, Inc., d/b/a Thompson International ("McKechnie") and Hayes Wheels International, Inc. ("Hayes") of infringing U.S. Patent No. 5,597,213, entitled "Wheel and Overlay Assembly" ("the '213 Patent").

The '213 Patent concerns decorative overlays for the outwardly-facing surface of automotive wheels. The overlays may be made of high-impact plastic and plated with a bright metal, such as chromium, to enhance the appearance of the underlying steel or aluminum wheel. The asserted claims are directed to the method of applying the overlays to the wheels. Claim 11 is representative of the asserted claims insofar as the present Public Use Defense issue is concerned, and is reproduced below with highlighting added to focus on the present issues:

11. A method for assembling an overlay to a wheel having a disk portion and a rim portion circumscribing said disk portion, said disk and rim portions defining an outboard surface of said wheel, said method comprising the steps of:

forming said overlay to have an inboard surface configured to face said outboard surface of said wheel upon assembling said overlay to said wheel, said overlay being configured so as to *form a gap* between said inboard and outboard surfaces upon assembling said overlay to said wheel;

---

1. The District Court adopted the Special Master's Amended Report and Recommendation of April 17, 2001 (hereafter, "Rep. and Rec."), following briefing and a hearing on the parties' objections thereto.

*selectively depositing a curable adhesive* on at least one of said inboard and outboard surfaces such that said curable adhesive is between said overlay and said wheel upon assembling said overlay with said wheel, *said curable adhesive being deposited in an amount that is insufficient to entirely fill said gap;* and

*assembling said overlay to said outboard surface* of said wheel with said curable adhesive so as to form said gap and permanently secure said overlay to said wheel, *at least one void being present between said overlay and said outboard surface of said wheel.*

According to the specification of the '213 Patent, the adhesive is applied as an elongated bead near the perimeter of the outboard surface of the wheel and around the lug bolt openings, to prevent the ingress of water and dirt between the overlay and the wheel (6:51–55). The volume of the applied adhesive is such that, even after the beads are flattened and spread apart by the assembly of the overlay and the wheel, large voids remain in the original gap between the assembled parts where there is no adhesive (4:59–5:5; 6:58–64).

The '213 Patent-in-suit was filed on June 6, 1995, and the critical date for purposes of the 35 U.S.C. § 102(b) public use bar is therefore June 6, 1994 ("the critical date").

## B. *The Public Use Defense at Trial*

There is no dispute that the accused Ford F–150 truck wheels shipped by Defendants after December, 1994 were in accordance with the asserted patent claims. At trial, the dispute concerning the Public Use Defense was whether Defendants' pre-critical date (*i.e.*, pre-June 6, 1994) prototypes of the F–150 wheels were made in accordance with such patent claims. The specific factual issue was whether Defendants proved, by clear and convincing evidence, that the prototype wheels satisfied the patent claim requirement that the amount of adhesive was "insufficient to entirely fill said gap," with the result that "at least one void [was] present" between the assembled overlay and wheel.

Defendants presented trial testimony of Hayes employees Maloney and Heck and of McKechnie employee Beam (who later joined Hayes in 1995). Their testimony and a description of the supporting documents are summarized in the Rep. and Rec. at pp. 45–50. Recapitulating their testimony, the prototype wheels were assembled during April–June, 1993, and the adhesive was applied in accordance with the pattern shown in Figure 2 of Hayes' U.S. Patent No. 5,435,631 ("the '631 Patent"). The pattern of Figure 2 shows inner and outer circular beads of adhesive, interconnected by a series of radial-line beads. Maloney was responsible for the assembly; Maloney and Heck were the co-patentees of the '631 Patent; and Beam observed the prototype assembly. When the cladding was removed from one of the assembled wheels, they observed gaps in the adhesive coverage. They never tried to obtain full coverage, and gave plausible reasons why full coverage would be impractical and undesirable. Chase, the patentee of the '213 Patent in suit, agreed that full coverage was economically undesirable, and the '213 Patent itself cites the economic benefits of selective application of the adhesive.

The '631 Patent was significant to the Public Use Defense because Defendants relied on it as part of their attempt to provide documentary corroboration of the trial testimony of their own witnesses. It is also central to Defendants' present charge of fraud on the Court, which concerns (1) Lacks' allegedly contradictory interpretations of the text of this patent at trial and subsequently during Lacks' *ex*

parte USPTO proceedings on a different Lacks patent application, and (2) Lacks' allegedly contradictory assertions as to the extent of adhesive coverage that results from actual use of the '631 Patent's disclosed method of assembly and adhesive pattern.

Heck testified that his disclosure of this invention to his patent attorney was made in August, 1993, shortly after the F–150 wheel prototypes were delivered to Ford for testing. The application for the '631 Patent was filed on February 24, 1994, about three months before the June 6, 1994 critical date.

Pertinent portions of the '631 Patent specification state that the adhesive pattern "is selected so that when the wheel cover 16 is positioned on the disc 14 [a portion of the wheel itself] and pressure applied thereto, a smearing of the adhesive 70 *over substantially the entire outboard face of the disc occurs,"* [2] and the adhesive *"covers substantially the entire interface* between the cover 16 and the disc 14 ... to provide a seal and prevent water, mud, and other debris from entering [the gap]." [3] The specification provides no explicit reference to the presence or absence of voids in the adhesive coverage on the assembled wheel, and the patent drawings show no gap in the adhesive on the assembled wheel.

In the infringement suit, Lacks did not dispute that a *pre*-assembly adhesive pattern similar to that described in the '631 Patent was used in the pre-critical date prototype F–150 wheels. In fact, Lacks acknowledged that "[t]he most probable conclusion is that the '631 patent describes how Hayes was assembling its prototype cladded wheels" during the initial pre-criti-

cal date period.[4] Instead, the dispute at trial concerned the extent of *post*-assembly adhesive coverage, with the meaning of "substantially" in the quoted excerpts being the subject of vigorous debate in the post-trial pleadings of the parties. According to Lacks, the '631 Patent disclosed full-surface *post*-assembly coverage, without voids, and Lacks argued that actual use of the disclosed method produced that result. Lacks contended that it was not until more than two months after the critical date that Hayes made an adhesive pattern and volume change that resulted in only *partial* coverage (with associated voids) after assembly.[5]

The Special Master concluded that this patent, though a contemporaneous document, was insufficient to corroborate the Defendants' testimony as to the specific adhesive coverage details:

"Defendants, relying on dictionary definitions, argue that the use of 'substantially' to describe the adhesive coverage after assembly does not mean that 100% coverage was contemplated, else 'entirely' or 'completely' would have been used. In the absence of some further discussion of an objective to reduce cost or weight, or to create voids, the Special Master finds that word choice too slim a reed to establish corroboration for Defendants' position, particularly in view of the widespread use of 'substantially' by patent drafters as a 'weasel' word modifier to cover both an absolute and a slightly-less-than-absolute condition. Further, these patent documents are of limited evidentiary value as the [sic] to extent of adhesive coverage *actually used or offered for sale,* because meth-

---

**2.** Col. 3, lines 64–68 (emphasis added).

**3.** Col. 4, lines 1–5 (emphasis added).

**4.** Plaintiff's Proposed Findings of Fact and Conclusions of Law, Def. Exh. F, pp. 27–28.

**5.** Rep. and Rec., pp. 44, 51.

ods and structures often evolve from those disclosed in patents."

Rep. and Rec. at p. 50 (emphasis in original).[6]

Other contemporaneous Hayes and McKechnie documentary exhibits refer to ongoing activity on adhesively assembled cladded wheels, but the Special Master found these to be unpersuasive as corroboration that the prototype wheels used the adhesive coverage details that are part of the *claimed* invention. No testimony or documentation from any source other than Defendants Hayes and McKechnie was offered in support of the Public Use Defense.

■■■■ It was Defendants' burden to establish their Public Use Defense by clear and convincing evidence. "Mere testimony concerning invalidating activities is received with further skepticism because such activities are normally documented by tangible evidence." *Finnigan Corp. v. ITC,* 180 F.3d 1354, 1366–68 (Fed.Cir. 1999). Corroboration is required, even when the testifying witness is disinterested, "because of doubt that testimonial evidence alone in the special context of proving patent invalidity can meet the clear and convincing evidentiary standard to invalidate a patent." *Ibid.* The Special Master concluded that, "Here, even the documentation is incomplete, ambiguous or contradictory" (Rep. and Rec., p. 45). Defendants did not establish correlation between the alleged public use and the

*claimed invention* by clear and convincing evidence (*Id.* at 55).[7]

### C. The Present Claim of Fraud Upon the Court

Defendants' basic contention is that Lacks took inconsistent positions on the proper interpretation of Hayes '631 Patent: during the patent infringement trial and appeal, Lacks asserted one interpretation of the Hayes '631 Patent to negate that patent's value as corroboration for Defendants' Public Use trial testimony; but during the approximately contemporaneous USPTO prosecution of a different Lacks patent application, Lacks asserted a different interpretation of the '631 Patent to negate its relevance as prior art against that pending Lacks patent application. According to Defendants' present claim of fraud upon the Court, their Public Use Defense would have been sustained, or at least the Court's consideration of that defense would have been different, had Lacks presented to the Court the same interpretation of the '631 Patent that it presented *ex parte* to the USPTO. "Because the actions of Lacks' patent counsel violated their duties as officers of the court and undermined the integrity of the judicial process, they constitute fraud not merely upon Defendants, but fraud upon the court" (Def.Motion, p. 2).

At the hearing on the present motion, Defendants for the first time stressed certain representations in Lacks' post-trial pleadings that went beyond interpretation

---

6. Neither the '631 Patent nor U.S. Patent No. 5,664,845 (which issued from a continuation-in-part thereof) contain any references to actual commercial experience or observations concerning the extent of adhesive coverage, which comments might have enhanced the corroborative value of the '631 Patent.

7. Aside from the structural and process details of the Public Use Defense activities, the

Special Master concluded that those activities "were primarily commercial, rather than experimental, in character, and that the Defendants retained insufficient control over Ford's testing to negate the public use character of Ford's use of the prototype wheels made by Defendants' pre-critical date assembly method." *Id.* at p. 59.

of the '631 Patent *document,* and that instead were directed to the extent of adhesive coverage that would result from *actual use* of the disclosed method. These latter excerpts were also contended to be inconsistent with Lacks' *ex parte* statements in the USPTO.

### 1. *Lacks' Infringement Suit Assertions Concerning the '631 Patent Document*

In its October 1998 response to a summary judgment motion, Lacks described the disclosure of Hayes' '631 Patent as follows:

> "The adhesive pattern is shown on [Figure 2 of the patent drawings] as it would appear before the cover is pressed onto the wheel. *Whether the adhesive will provide substantially full-surface coverage obviously depends on the thickness of the adhesive bead.* There is no indication of the amount of adhesive to be used on this drawing." [8]

Defendants note that Lacks' 1998 interpretation was that the '631 Patent disclosure *could* result in gaps in the post-assembly adhesive pattern, depending upon the thickness of the applied adhesive bead. But that was not the interpretation presented by Lacks at the later trial. It would also seem that the extent to which the adhesive spreads when the cover and disc are pressed together at assembly depends not only upon the initial pattern and *volume* of the applied adhesive but also upon the relative volumes of the applied adhesive and the original volume of the gap between the cover and disc.

In Lacks' June 2000 pre-trial brief, Lacks asserted that "the '631 patent also specifically disclosed a *full-surface* application of the adhesive." [9] In the immediately following two sentences, however, the same brief referenced Figure 2 of that patent and summarized the '631 Patent's disclosure by stating, "When the cladding is pressed onto the wheel, the adhesive is spread to cover *substantially* the entire wheel face" (citing col. 3, lines 64–68 of the patent). [10]

In Lacks' September 2000 proposed post-trial findings of fact, it quoted the relevant passage of the '631 Patent specification, and then commented:

> "Thus, the written description of the method for applying the adhesive discloses a *substantially full surface* application of the adhesive between the cladding and the wheel. There is nothing in the written description to suggest a **post-assembly** pattern with a void or voids in the adhesive pattern as taught by the '213 patent [*i.e.,* the Lacks patent-in-suit]." [11]

Thus, Lacks expressly stated that the post-assembly adhesive pattern *disclosed by* the '631 Patent was different than in Lacks' '213 Patent, because the '631 Patent did not suggest or disclose voids in the adhesive coverage following assembly.

Similarly, Lacks' again argued in its October 2000 post-trial brief that the written description of the '631 Patent contains "*no disclosure or teaching* of using a method and associated adhesive pattern which is selectively applied so as to leave *a void or voids* in the gap between the cover and the wheel upon assembly." [12]   Similarly ex-

---

8.   Def. Joint Motion, Exh. G, p. 13 (emphasis added).

9.   *Id.* at Exh. H, p. 17 (emphasis in original).

10.   *Ibid.* (emphasis added).

11.   *Id.* at Exh. F, p. 27 (italics added; bold and underlining in original).

12.   *Id.* at Exh. I, p. 24 (emphasis added).

pressed arguments and quotes from the '631 Patent were included in Lacks' February 2001 Objections to the Special Master's Report and Recommendation.[13]

Finally, in its December 2001 corrected Reply Brief to the Court of Appeals, Lack quoted the relevant portion of the '631 Patent specification, and argued that:

> "Hayes specifically adopted the **pre-assembly** adhesive pattern of Figure 2 of the '631 patent because it would result in smearing the adhesive over *substantially the entire outboard face* of the wheel once the cover was pressed onto the wheel. The '631 patent's drawings and written description *do not teach* a method and selectively deposited adhesive pattern that leaves *a void or voids* in the gap between the cover and the wheel upon assembly."[14]

Summarizing Lacks' assertions during the infringement suit concerning the '631 Patent *document:* it made a single reference to "full-surface" adhesive coverage, without the "substantially" qualifier; but most of the references either accurately quoted the actual text of the '631 Patent or fairly paraphrased it using the "substantially" qualifier. Lacks' repeatedly stressed that the '631 Patent, *as a document,* did not describe or teach that voids would remain in the gap between the cover and wheel after assembly.

### 2. *Lacks' Infringement Suit Assertions Concerning Results of Actual Use of the Method Described in the '631 Patent*

As Defendants stressed for the first time at the hearing on the present motion, Lacks' infringement suit assertions concerning the '631 Patent went beyond

Lacks' interpretation of what the document itself taught. Lacks made explicit assertions concerning the extent of adhesive coverage that was achieved as a result of *actual use* of the method disclosed in the '631 Patent. These assertions were made as arguments of counsel in Lacks' pre-trial and post-trial pleadings; no trial evidence on that subject was presented by Lacks.

Lacks asserted in its Pre–Trial Brief:

> "Thus, there will be no probative evidence to support defendants' contention that they had the invention claimed in the '213 patent on sale and/or in public use more than one year before the patent application was filed. Moreover, because Hayes did not determine its final adhesive pattern until September of 1994, *it could not have made a public disclosure of the claimed invention to Ford or anyone else more than one year prior to the June 6, 1995 application date for the '213 patent.*"[15]

In Lacks' September 2000 Proposed Findings of Fact and Conclusions of Law, it asserted:

> *"It does not make sense that Hayes or McKechnie would be supplying prototypes to Ford with a post-assembly adhesive pattern that is covering substantially less than the entire surface of the disc surface,* while at the same time disclosing as its preferred embodiment in two separate patent applications [one of which was the '631 Patent application] a cladded wheel in which the adhesive is smeared over substantially the entire outboard surface of the disc. The most probable conclusion is that the '631 patent accurately describes how Hayes was

---

13. *Id.* at Exh. J, p. 12.

14. *Id.* at Exh. K, p. 17 (underlining added; bold in original).

15. *Id.* at Exh. H, p. 19 (emphasis added).

assembling its prototype cladded wheels during the period from August of 1993 through at least February 28, 1994. This description contradicts the testimony of Heck, Maloney and Beam."[16]

In Lacks' October 2000 Post–Trial Brief, it stressed the trial evidence that Defendants had significantly reduced the amount of adhesive for its final adhesive pattern according to a post-critical date drawing of September, 1994, and argued:

"Consequently, *defendants could not have had a product embodying the claimed invention on sale or public use prior to the critical date.*"[17]

In the same document, Lacks argued that Defendants could not point to a single pre-critical date document showing development of the claimed method before the critical date, but then went further by categorically stating that:

"*Defendants did not have a product* embodying the claimed invention to commercially exploit before the critical date. *They had not reduced the claimed invention to practice* or had it ready to patent before the critical date."[18]

### 3. *Lacks' Assertions to the USPTO Concerning the '631 Patent Document and the Results of Actual Use of the Method Described Therein*

Lacks filed a patent application in the USPTO on June 12, 2001, identified as Serial No. 09/879,533 ("the '533 Application"). The application and its USPTO prosecution history include several statements by Lacks' patent attorney referencing the extent of adhesive coverage described in the prior art '631 Patent. But some of the attorney's statements describe the physical properties of wheels assembled in accordance with that patent's described method, which statements go beyond the actual text of the '631 Patent specification. Defendants' present claim of fraud on the Court is based on their assertion that Lacks' statements to the USPTO contradict Lacks' assertions at trial, and show that the latter were either intentionally false or in reckless disregard of their truth or falsity.[19]

Lacks' *ex parte* statements to the USPTO concerning the teachings of the '631 Patent are essentially contemporaneous with its statements to the Court in the infringement trial. Attorney Remy J. VanOphem was an attorney of record in the infringement suit; an attorney in his law firm signed the original '533 Patent application transmittal papers to the USPTO, and Mr. VanOphem signed the subsequent transmittal papers and amendments. The gravamen of Defendants' charge of fraud on the Court is that statements made by Lacks' attorneys to the USPTO demonstrate that Lacks had information or held an opinion that was inconsistent with representations made by its attorneys to the Court concerning either the disclosure of the '631 Patent or the results of actual use of the adhesive pattern described therein. As will be more fully discussed in a follow-

---

16. *Id.* at Exh. F, pp. 27–28, ¶ 16 (emphasis added).

17. Pages 20–21, cited at the motion hearing, but not included in Defendants' Exh. I (emphasis added).

18. Page 26, cited at the motion hearing, but not included in Defendants' Exh. I (emphasis added).

19. The '533 Application was granted as U.S. Patent No. 6,729,695 on May 4, 2004, and came to the attention of Hayes' trial counsel shortly thereafter. Declaration of Pavelko, Def. Exh. N.

ing section, one of the elements of fraud on the court is that conduct of an officer of the court was "intentionally false, willfully blind to the truth, or is in reckless disregard of truth or falsity." *Demjanjuk v. Petrovsky,* 10 F.3d 338, 348 (6th Cir.1993). Therefore, the present task requires scrutiny of Lacks' statements to the USPTO to determine whether they compel a conclusion that Lacks' representations to the Court during the infringement trial met the *Demjanjuk* standard.

It is useful to understand that the context of Lacks' statements to the USPTO in its '533 Application was its attempt to establish a patentable difference between the wheel assembly method there claimed and prior art that included the Lacks-owned Chase '213 Patent-in-suit and the Hayes-owned Maloney '631 Patent. The stated objective of the '533 Application invention was to provide an assembly method that "more effectively and efficiently fills the gap between the wheel and wheel cover"[20] Thus, in the "Background of the Invention" portion of the '533 Application specification, Lacks explained that its earlier '213 Patent utilizes selective application of the adhesive "to establish voids" that provide certain advantages.[21] The accompanying description of the Maloney '631 Patent states that the disclosed adhesive pattern "is selected so that when the wheel cover is installed on the wheel disc, a smearing of the adhesive occurs over substantially the entire outboard face of the wheel disc."[22] This statement is essentially a direct quote from the '631 Patent,[23] and therefore sheds no light on the question of Lacks' *interpretation* or opinion concerning that patent's teachings. De-

fendants, however, rely on the '533 Application text that immediately follows that excerpt, which text introduces Lacks' own editorial comment:

"Unfortunately, *the patterns of adhesive as disclosed in* the Chase patents and *Maloney et al. have several well known drawbacks.* First, such high-strength adhesives are costly, take an exceedingly long time to cure, and may require application of heat to cure properly. . . .

Second, use of such high-strength adhesives *ordinarily results in a substantial air gap* in multiple areas between the wheel cover and wheel. *The existence of such an air gap has generated a concern among wheel engineers* relating to the sound deadening abilities of the adhesive between the wheel and the wheel cover. Since automobile wheels experience harsh environments during their useful life, it has often been the practice of wheel engineers to rap on the wheel cover attached to the wheel to gauge the 'soundness' of the wheel assembly. Unfortunately, however, *the inclusion of the air gap* between the wheel cover and the wheel *tends to yield* a relatively loud and undesirable hollow sound when rapped upon.

Finally, application of such high-strength adhesives *usually results* in a relatively thin bead that is often *inadequate to fill the gap* between the wheel cover and wheel in certain areas and thereby necessitates a close relationship therebetween. . . ."[24]

20. Plaintiff's Exhibit 1, p. 13. See also, *Id.* at p. 16, lines 18–22 and p. 17, lines 1–3.

21. *Id.* at p. 8.

22. *Id.* at p. 10.

23. Compare with text of the '631 Patent quoted at footnote 2 and accompanying text.

24. *Supra* note 20 at pp. 10–12 (all emphasis added).

A first question raised by these statements is whether the referenced "air gap" (with bold italics added) is (1) the space between the outboard surface of the wheel and the inboard surface of the cover, *i.e.*, the zone where they do not directly contact each other because of their shape and dimensional differences, irrespective of whether that zone is partially or completely filled with adhesive after assembly, or (2) what is elsewhere typically referred to by the parties as a "void," *i.e.*, zones in the space between the *assembled* wheel and cover that are not filled by adhesive. "Gap," as used everywhere else in the '533 Application, refers to the space "18" between the outboard surface of the wheel and the inboard surface of the cover. The zones that, following assembly, are unfilled by adhesive are identified by a different word, "voids," and by a different numeral, "20." Furthermore, the claims in the patent that resulted from the '533 Application make the same clear distinction between the "gap" and the "voids." Claim 1 calls for "a **gap** between said wheel and said wheel cover; and a bead of closed-cell foamed adhesive at least partially spread between said wheel cover and said wheel and occupying a predetermined volumetric portion of said **gap**," while dependent claim 4 states that the assembly further comprises "at least one **void** defined by said partially spread bead of closed cell adhesive between said wheel cover and said wheel." [25] Reference to "gaps" in the above-quoted paragraph beginning with "Second" therefore makes no sense, because "gaps," as that term is used elsewhere throughout the application, result from the shape and dimensional differences between the wheel and cover, not from the use of any particular type of adhesive that may be placed therein.

Lacks' present opposition to Defendants' interpretation of the quoted '533 Application excerpts offers various *post hoc* explanations for how air gaps might be created other than by intentionally designing the pattern, volume and type of adhesive to create voids in the adhesive coverage of the assembled wheel. And Defendants counter with arguments as to why Lacks' explanations are not persuasive. The Special Master is persuaded that, although the text is not free from ambiguity, the '533 Application as a whole more logically supports a conclusion that "air gap" at page 11 of the specification was meant to refer to a "void" as that term was elsewhere used in that document.

More to the point of the present fraud issue, however, is another question concerning these excerpts from the '533 Application. Was Lacks' patent counsel basing the highlighted references to "well known drawbacks" and "results" and "concern among wheel engineers" on an interpretation of the '631 Patent document itself or upon information acquired elsewhere, as from observation or reports of actual wheel assemblies made in accordance with the '631 Patent's description? The answer to that question has a significant bearing upon the present fraud issue, which requires a comparison of those statements in the '533 Application with assertions to the Court made by the same or different Lacks counsel in the present infringement suit concerning the meaning of the '631 Patent disclosure.

Although the Chase '213 Patent explicitly and intentionally creates "voids" in the adhesive coverage after assembly, these quoted comments from the '533 Application concerning alleged "gaps" resulting from use of the Maloney et al '631 Patent's disclosed adhesive pattern find no direct support in the '631 Patent document itself.

**25.**  U.S. Patent No. 6,729,695, Def. Exh. M, columns 15–16 (emphasis added).

Therefore attribution of "gaps" resulting from use of the '631 Patent's disclosed adhesive pattern can only be based on Lacks' *interpretation of the document* or from Lacks' knowledge of results of *actual commercial experience* in the use of that disclosed adhesive pattern. Determination of which source served as the basis for the quoted statements requires consideration of all of the relevant statements by Lacks in the '533 Application and prosecution history.

The patent examiner initially rejected the '533 Application claims as obvious in view of U.S. Patent No. 5,664,845 to Maloney et al ("the '845 Patent"). That patent was a continuation-in-part of the '631 Patent, and the portions of its text pertinent to the question of adhesive coverage as found in the '631 Patent included the same text (but for changes in reference numerals).[26] In Lacks' response of April 2, 2003, Lacks made several references to the adhesive coverage disclosure of the '845 Patent, most of which were accurate quotes or fair paraphrasing that contribute nothing to the question of how Lacks *interpreted* the Maloney '631 and '845 Patent documents.[27] Two, however, were more in the nature of editorial comments, and therefore warrant further consideration.

In the first, Lacks stated, "As clearly pointed out in the background and history of the application the *full face* adhesive patterns *disclosed* in both the Chase and Maloney et al patents have several well

known drawbacks."[28] This statement is puzzling, because reference to "full face" seems inconsistent with comments about "air gaps" in the "background and history" descriptions of the Chase and Maloney patents quoted above at footnote 23 and accompanying text. However, Lacks' description of the Maloney patent as disclosing "full face" adhesive coverage seems to reflect an interpretation that is fully consistent with Lacks' representations to the Court in the infringement suit.

In the second editorial-type comment, Lacks told the USPTO that "Maloney et al specifically teaches at column 5, lines 32–38 that the expandable foam material covers substantially the entire interface between the wheel cover and disc 73, *thereby completely filling any void that may exist.*"[29] This statement refers to an alternative embodiment of the Maloney '845 Patent, wherein "expandable foam adhesive" is used in place of the "two-part epoxy" adhesive of the first embodiment.[30] Essentially the same language (but with different reference numerals) is used to describe the same two embodiments in the parent Maloney '631 Patent.[31] Although Defendants correctly point out that this "completely filling any void" refers to the foam adhesive embodiment rather than to the high-strength adhesive embodiment that is relevant to the present motion,[32] the '631 and '845 Patents each use the "substantially the entire interface" phrase

26. Compare Plaintiff's Exh. 2, col. 5, lines 1–10 with Defendants' Exh. E, col. 3, line 64 to col. 4, line 6.

27. See, Plaintiff's Exh. 1, Response of April 2, 2003, at p. 6, lines 12–20; p. 7, lines 3–8; p. 9, line 17 to p. 10, line 3; p. 11, lines 16–19

28. *Id.* at p. 7, lines 12–15 (emphasis added).

29. *Id.* at p. 12, final line to p. 13, line 3 (emphasis added).

30. Compare col. 5, lines 32–38 with col. 4, line 60 to col. 5, line 10.

31. Col. 4, lines 27–33, and Col. 3, line 56 to Col. 4, line 6. Defendants' counsel was therefore mistaken when he stated at the hearing on this motion that the '631 Patent does not disclose a foam adhesive embodiment. Tr. at p. 61, lines 10 and 24–25.

32. Tr. at p. 66, line 20 to p. 67, line 12.

to describe the coverage obtained by *both* types of adhesive. Therefore, Lacks' stated interpretation of "substantially" can fairly be applied to the extent of coverage resulting from assembly with the high-strength adhesive as well. That interpretation by Lacks, that "substantially" in both Maloney patents means complete coverage, precluding the presence of gaps or voids, is fully consistent with Lacks' assertions at trial.

After consideration of all the relevant statements by Lacks' attorney in the '533 Patent application and prosecution history, the Special Master concludes that the two statements quoted immediately above, namely, "full face adhesive patterns" and "thereby completely filling any void," are entitled to the most weight on the issue of how Lacks expressed its interpretation of the '631 Patent *document* in the USPTO proceedings. The first statement specifies that "full face adhesive patterns" is what is "disclosed in" the Maloney patent, thereby avoiding any possible ambiguity that the basis for that statement was experience with actual use of the disclosed method. The second statement expressly cites and accurately quotes (but without use of quotes) the text used in both Maloney et al patents, namely, "covers substantially the entire interface between the wheel cover and disc," and interprets that text to mean that the disclosed method "completely fill[s] any void that may exist." Both statements are therefore fully consistent with Lacks' infringement suit assertions to the Court that Maloney et al '631 Patent does not teach or suggest the presence of voids in the adhesive coverage.

The Special Master therefore finds that Defendants have failed to show, even by a preponderance of the evidence, that Lacks or its attorneys held an opinion, during the patent infringement suit pre-trial, trial, post-trial or appeal proceedings, that

the '631 Patent *disclosure* expressly taught or suggested that the disclosed assembly technique resulted in voids in the adhesive coverage after assembly.

However, the specific '533 Application specification excerpt relied upon by Defendants (footnote 24, *supra*, and accompanying text) stands in clear contrast to all the other statements made by Lacks' attorney to the USPTO about the Maloney '631 Patent. This excerpt appears to rely upon field experience with actual use of "the patterns of adhesive as disclosed in the Chase patents and Maloney et al.," rather than upon Lacks' interpretation of the '631 Patent document itself. It refers to *"well known* drawbacks" that *"result"* from use of the disclosed adhesive pattern, and states that "[t]he *existence* of such an air gap *has generated concern* among wheel engineers." Specifically, "application of such high-strength adhesives *usually results* in a relatively thin bead that *is often* inadequate to fill the gap." The presence of such air gap *"tends to yield* a relatively loud and undesirable hollow sound *when rapped upon."* The '631 Patent says nothing about these phenomena, and provides no basis for interpretation or speculation that such phenomena might result from use of the disclosed method of assembly. If these statements were true, they could only be based on "well known" experience with wheels actually assembled with the disclosed adhesive pattern.

The statements of Lacks' attorney to the USPTO on June 12, 2001 that it was "well known" that use of the adhesive pattern disclosed in the '631 Patent *"ordinarily results* in a substantial air gap in multiple areas between the wheel cover and wheel," and that "application of such high-strength adhesive *usually results* in a relatively thin bead that is *often* inadequate to fill the gap between the wheel cover and wheel," appear to contradict the Septem-

ber and October 2000 assertions by Lacks' attorneys to the Court that:

> "*It does not make sense* that Hayes or McKechnie would be supplying prototypes to Ford with a post-assembly adhesive pattern that is covering substantially less than the entire surface of the disc surface ..."

> \*　　\*　　\*　　\*　　\*　　\*

> "Consequently, *defendants could not* have had a product embodying the claimed invention [*i.e.,* with voids] on sale or public use prior to the critical date."

> \*　　\*　　\*　　\*　　\*　　\*

> "Defendants *did not* have a product embodying the claimed invention [*i.e.,* with voids] to commercially exploit before the critical date. They *had not* reduced the claimed invention to practice or had it ready to patent before the critical date."

However, the quoted statements to the USPTO are not free from ambiguity and other pertinent issues. These issues will be discussed in the following section.

### D.　*The Applicable Law*

Defendants assert that Lack's patent counsel, an officer of the court, "made positive averments to this Court and to the Federal Circuit that were either intentionally false or in reckless disregard of their truth or falsity" and that "deceived both this Court and the Federal Circuit, and interfered with the courts' ability to properly adjudicate Defendants' Public Use Defense." Defendants contend that these actions constituted fraud upon the court and that the judgment so obtained should be set aside (Def. Br. at p. 14).

Defendants filed this motion pursuant to Fed.R.Civ.P. 60(b)(2) and (3). That rule, in pertinent part, provides:

> "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:

> \*　　\*　　\*　　\*　　\*　　\*

> (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 59(b);

> (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

> \*　　\*　　\*　　\*　　\*　　\*

> The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.... **This rule does not limit the power of a court** to entertain an independent action to relieve a party from a judgment, order, or proceeding ... or **to set aside a judgment for fraud upon the court**" (emphasis added).

With regard to the highlighted portion of Rule 60(b), "[t]here is no time limit for such proceedings, nor does the doctrine of laches apply." *United States v. Daniel S. Buck et al.,* 281 F.3d 1336, 1342 (10th Cir.2002). Because one basis for the present motion is a claim of fraud upon the court, the alternative bases of newly discovered evidence or fraud (not necessarily upon the court) under sub-divisions (2) and (3) of Rule 60(b), respectively, or an independent action in equity, appear to be superfluous and need not be considered.

■　Proof of fraud upon the court must be by clear and convincing evidence. *Ibid.*

■　Fraud upon the court, according to a definition applied by the Court of Appeals for the Sixth Circuit, consists of conduct:

"1. On the part of an officer of the court;

2. That is directed to the 'judicial machinery' itself

3. That is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth;

4. That is a positive averment or is concealment when one is under a duty to disclose;

5. That deceives the court."

*John Demjanjuk v. Joseph Petrovsky et al.,* 10 F.3d 338, 348 (6th Cir.1993).

The Court in *Demjanjuk* further observed that:

"No court system can function without safeguards against actions that interfere with its administration of justice. This concern must be balanced against the necessity for finality of court judgments; thus, only actions that actually subvert the judicial process can be the basis for upsetting otherwise settled decrees.

Professor Moore's definition is frequently cited:

'Fraud upon the court should ... embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct.'"

*Id.* at 352 (quoting from 7 Moore's Federal Practice and Procedure, P60.33). See also, *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944).

Defendants also contend that Lacks' counsel violated his duty of candor toward the tribunal, as provided by Rule 3.3 of the Rules of Professional Conduct adopted by the Michigan Supreme Court. That rule provides in pertinent part:

"A lawyer shall not knowingly:

\*     \*     \*     \*     \*     \*

(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

\*     \*     \*     \*     \*     \*

(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures."

MRCP 3.3.

One of the Comments to the Rule provides this elaboration:

"[A]n assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."

Comment, MPRC 3.3.

**E. *Analysis***

■ As explained above, the conduct in question involved two independent sets of assertions by Lacks' counsel: (1) those relating to the proper interpretation of the disclosure of the '631 Patent, and (2) those relating to the actual adhesive coverage results obtained by use of that patent's adhesive pattern, such as in Defendants' pre-critical date assembly of prototypes for Ford Motor Company.

The first of the five *Demjanjuk* fraud elements is that the alleged fraud be committed by an officer of the court. Although Lacks' patent attorney, Remy J.

VanOphem, was both *co*-counsel of record during the original trial and appeal of this case and in the '533 Patent application submitted to the USPTO, more specificity is required to establish that this element has been satisfied. The present record does not indicate: (1) whether Mr. VanOphem either wrote or approved pages 10–12 or any other portion of the '533 Patent application specification, or was otherwise aware of the "well known" facts described therein;[34] (2) whether Mr. VanOphem wrote, co-signed, read or otherwise approved the infringement suit pleadings quoted above at footnotes 15–18 and accompanying text; and (3) whether the facts that were said to be "well known" in the June 2001 patent application were also known to the lawyer(s) who wrote, signed, read or approved the September/October 2000 submissions to the Court at the time of such submissions. Those missing links preclude a finding that the first element of *Demjanjuk* have been proven by clear and convincing evidence on the present record, either with respect to the proper interpretation of the '631 Patent document or to the results of actual use of the assembly technique disclosed therein in the assembly of the Ford prototype wheels.

The second element is that the alleged fraud be directed to the judicial machinery itself. The representations relied upon by Defendants were made in Lacks' pleadings to the Court, and such pleadings were intended to influence the Court's decision-making process. Therefore, the second element was satisfied here.

The third element requires that the representation be intentionally false, willfully blind to the truth, or in reckless disregard

for the truth. With regard to the proper interpretation of the '631 Patent, and for the reasons previously discussed, the Special Master finds that the evidence presented in support of this motion fails to establish that Lacks' patent counsel ever interpreted the *disclosure* of that patent concerning the extent of adhesive coverage differently than the interpretations advocated in the infringement trial. Therefore, no false or reckless statement on that subject was made to the Court.

Turning to the two sets of statements that relate to results of actual use of the disclosed adhesive pattern, these statements appear, at first reading, to contradict each other. However, closer consideration exposes several ambiguities or possible omissions. First, aside from the previously discussed issue of whether "gap" meant "void" (in the words of the '213 Patent claims), it seems logical that the ability of the adhesive to fill the gap and preclude any voids in the adhesive coverage would depend upon at least four factors: the volume of the original air gap between the two wheel components, the volume of the adhesive applied,[35] the nature of the adhesive and the pattern of adhesive application. Yet the excerpt from the '533 Application only points to the "patterns of adhesive" as the source of the "well known" drawbacks. On the present record, it is inappropriate to conclude that the adhesive pattern *per se* ordinarily produced voids, as that "drawback" might readily have been avoided by application of more (or a different type of) adhesive, although in the same pattern. Second, it is not clear from the three-page excerpt from the '533 Application's specifi-

---

34. Mr. VanOphem signed Applicant's Reply of April 2, 2003 (see text accompanying footnote 28, *supra*) which specifically referred to the application's background section discussion of the "well known drawbacks," but his state-

ments did not specifically reference the subject of coverage achieved by the Maloney patent's adhesive pattern.

35. See text accompanying footnote 8, *supra*.

cation that *all* of the listed drawbacks resulted from use of the patterns disclosed in *each* of the several referenced patents. Hence, the statements cannot be considered as conclusively reflecting knowledge that use of the adhesive pattern described in the *'631 Patent* necessarily or even "ordinarily" produced voids. Therefore, on the present record, Defendants' have not established by clear and convincing evidence that Lacks' assertions to the Court concerning the results of Defendants' pre-critical date use of the assembly method of the '631 Patent were made in reckless disregard for the truth.

The fourth element under *Demjanjuk* requires that there have been a positive averment or a concealment when one is under a duty to disclose. With regard to the statements concerning the proper interpretation of the '631 Patent document, for the reasons previously discussed, there was no false or reckless statement and no relevant concealment.

With regard to the actual use of the disclosed assembly method to make the Ford prototype wheels, it was Defendants' burden to establish the Public Use Defense by clear and convincing evidence. Lacks had no duty to present any evidence on that subject. As was its right, Lacks left Defendants to their proofs, and argued to the Court that Defendants failed to satisfy their burden of proof. But Lacks' counsel went beyond that argument. Lacks admitted that Defendants used the assembly method and adhesive pattern described in the '631 Patent before the critical date,[36] and Lacks' counsel made "positive averments" to the Court that Defendants' use "could not," "had

not" and "did not" put into public use the claimed invention (*i.e.,* had not produced voids in the assembled adhesive pattern). Not long thereafter, a member of Mr. VanOphem's firm, who is not identified in the record, made representations to the USPTO that it was a "well known" fact that use of what may or may not be that same adhesive pattern "ordinarily," "usually" and "often" results in those same voids. When counsel chose to make (or approve) a categorical denial to the Court that voids were created, rather than merely challenging his opponent's proofs as neither clear and convincing nor corroborated, he imposed upon himself the duty to disclose any information known to that counsel that directly refuted those representations. On the present record, for the reasons previously stated, it cannot be concluded that this fourth element has been established by clear and convincing evidence that there was improper concealment of any information.

The final element under the *Demjanjuk* definition of fraud upon the court is that the conduct actually deceived the court and subverted the judicial process. With respect to counsel's assertions as to the proper interpretation of the '631 Patent disclosure, the Special Master, whose Report and Recommendation on the Public Use Defense was adopted by the District Court and affirmed by the Court of Appeals,[37] was not deceived and the judicial process was not subverted. Indeed, the present Special Master, as the author of the original Report and Recommendation, can state without reservation that he was not influenced by the evidence and argu-

---

36. See text accompanying footnote 16, *supra.*

37. "The Special Master's factual determinations as to the insufficiency of the documentary evidence are thorough." 322 F.3d at 1350. "In light of the Special Master's complete and

specific findings and his correct understanding of our case law on corroboration of oral testimony, we conclude that the Special Master committed no reversible error." *Id.* at 1351.

ments presented by *any* of the parties concerning the meaning of the disputed language of the '631 Patent. That document was found to be insufficient as corroboration because: (a) its sectional drawings show no gap in the adhesive coverage; (b) the text of the patent made no reference to voids; (c) the text's description of the adhesive coverage as extending over "substantially the entire" surface was not conclusive or definitive as to whether the coverage was 100% *or* very slightly less than 100% so that it left the "at least one void" required by the claims of the '213 Patent-in-suit, particularly "in view of the widespread use of 'substantially' by patent drafters as a 'weasel' word modifier to cover *both* an absolute and a slightly-less-than-absolute condition;" and (d) patent documents in general "are of limited evidentiary value" to prove that a particular method or structure was in actual commercial use at a particular time, because designs and processes typically evolve over time (sometimes even between the time a patent application is filed and the first actual reduction to practice or commercialization thereof).[38]

The unrelated and independent bases for the Special Master's rejection of the Public Use Defense were presented in the Amended Report and Recommendation, and are reiterated as follows:

1. The case law requires corroboration, preferably in the form of contemporaneous documentation, where alleged patent-invalidating activities are attempted to be proven by mere testimony of interested witnesses.[39]

2. "Here, even the documentation is incomplete, ambiguous or contradictory."[40]

3. Various calculations of adhesive volume or coverage offered by the parties during and after trial were based upon too many "uncertainties, assumptions and approximations," or were "incomplete," "speculative," "uncorroborated" or "contradictory."[41]

Notwithstanding this catalog of reasons why the underlying Amended Report and Recommendation explicitly disregarded the '631 Patent, Defendants mistakenly contend that a significant basis for the rejection of their Public Use Defense by both the District Court and the Court of Appeals was the Courts' "adoption of Lacks' interpretation of the '631 patent as teaching a full-surface application of adhesive."[42] The Amended Report and Recommendation did not adopt *either* party's interpretation of the '631 Patent. The rejection of Defendants' interpretation of "substantially" was not an adoption of Lacks' proffered interpretation. The Special Master characterized that term as a "'weasel word' widely used by patent drafters to cover both an absolute and a slightly-less-than-absolute condition," and therefore incapable of serving as a basis

---

**38.** Rep. and Rec. at 49–50. With regard to the common use of "substantially" as a term of approximation and "to avoid a strict numerical boundary to the specified parameter," see also, *Liquid Dynamics Corp. v. Vaughan Co., Inc.,* 355 F.3d 1361, 1368 (Fed. Cir.2004); *Verve, LLC v. Crane Cams, Inc. et al.,* 311 F.3d 1116, 1120 (Fed.Cir.2003); *Deering Precision Instruments, LLC v. Vector Distribution Systems, Inc. et al,* 347 F.3d 1314, 1322–23 (Fed.Cir.2003).

**39.** Rep. and Rec., p. 45.

**40.** *Ibid.* See also, *Id.* at 47–48 for a discussion of the inadequacies of Defendants' memos and minutes, Exhs. 567, 139 and 677, as corroboration; *Id.* at 49 for a discussion of the inadequacy of Hayes' 370 Patent.

**41.** *Id.* at 51–55.

**42.** Defendants' Brief in Support of Joint Motion, p. 10. See also, *Id.* at p. 1.

for distinguishing between those two conditions. Therefore, the judicial process was not subverted, and the Special Master did not rely upon and was not deceived by such assertions regarding the '631 Patent.

With respect to the infringement suit assertions of Lacks' counsel regarding the actual adhesive coverage results obtained by Defendants' pre-critical date assembly of prototypes for Ford Motor Company, the analysis under element five of *Demjanjuk* is less conclusive. In rejecting Defendants' Public Use Defense, the Amended Report and Recommendation never referred to and did not rely upon Lacks' "could not/did not/had not" assertions. They were unsupported by any relevant and probative evidence, and were superfluous in view of the several independent grounds for rejection of that defense, as listed above. The Special Master gave them no weight.

But unknown to Defendants and the Special Master, it now appears that those categorical assertions to the Court that voids were not created in the adhesive coverage of Defendants' pre-critical date prototype assemblies may have been contrary to what Lacks' patent counsel then believed to be "well known" facts. If so, counsel was then under the duty to disclose to the Court the contradictory "well known" facts that formed the basis for his statements to the USPTO.

As stated in the previously quoted Comment to MPRC 3.3, counsel's factual assertion to the Special Master should only have been made if he knew it was "true or believe[d] it to be true on the basis of a reasonably diligent inquiry." *If* the "well known" information in fact related to the lack of full adhesive coverage that ordinarily resulted when the pattern disclosed in the '631 Patent was used, then "failure to make a disclosure [of that 'well known' information] is the equivalent of an affir-

mative misrepresentation." *Ibid.* In the words of element four of *Demjanjuk*, this would have been a "concealment when one is under a duty to disclose."

Had the allegedly "well known" facts that use of the '631 Patent's assembly technique "ordinarily," "usually" and "often" results in voids been included in the record, the adjudication of the Public Use Defense could have easily reached a different conclusion. The Special Master might well have considered that evidence to supply sufficient corroboration of the testimony of Defendants' three witnesses to warrant a conclusion that the Public Use Defense had been proven by clear and convincing evidence. However, as the record stands, and for the several reasons previously discussed, Defendants have not established by clear and convincing evidence that element five of *Demjanjuk* has been satisfied.

### F. Conclusion

With respect to the issue of possible fraud upon the Court arising out of statements made by Lacks' counsel concerning the proper interpretation of the '631 Patent document, the Special Master recommends that the Court conclude that such fraud has not been established by clear and convincing evidence, and that the Motion be denied with prejudice.

With respect to the issue of possible fraud upon the Court arising out of statements made by Lacks' counsel concerning results of actual use of the adhesive pattern disclosed in the '631 Patent to make the pre-critical date Ford prototype wheels, the Special Master finds that, although the present record does not establish fraud by clear and convincing evidence, a substantial and serious question as to that specific issue has been raised by Defendants' Joint Motion. Highly material information pertinent to which of Lacks'

counsel wrote, signed, approved or knew of the previously cited statements appearing at pages 10–12 of the '533 Application, or knew of the referenced facts, and when such counsel knew of such facts, is solely within the knowledge of Lacks' counsel. Furthermore, it was not until the hearing on the present motion that Defendants highlighted for the Special Master's and Lacks' attention (and identified some of the supporting evidence) Lacks' post-trial statements concerning its apparent knowledge of the results of actual use of the assembly method disclosed in the '631 Patent. Lacks has therefore not had an adequate opportunity to respond to that particular point.

Because of the Court's vital interest in preserving the integrity of the judicial process, while balancing the necessity for finality of judgments, the Special Master recommends that the Court deny this second aspect of the present Motion *without* prejudice, and issue an Order authorizing Defendants to take limited and sharply-focused discovery concerning (1) the extent and timing of knowledge of the various counsel for Lacks (trial counsel of record and each of the attorneys or other persons in Mr. VanOphem's firm who participated in the preparation and prosecution of the '533 Patent application) on the "well known" drawbacks of the adhesive patterns referenced at pages 10–12 of the specification of that application, and (2) the role of Mr. VanOphem in the writing, signing, reading, or approval of the above-referenced post-trial infringement suit pleadings on the subject of the alleged absence of voids in the adhesive coverage of the pre-critical date Ford prototype wheels assembled by Defendants ostensibly in accordance with the disclosure of the '631 Patent.

It is further recommended that, following such discovery, Defendants be granted the right to renew the present motion to set aside the judgment to the extent that (1) it be confined to the infringement suit and USPTO statements relating to results of actual use of the adhesive pattern disclosed in the '631 Patent, including such use for assembly of the pre-critical date Ford prototype wheels, and (2) that is rely at least in part upon the supplemental record generated by such discovery.